## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| BRAD WATERMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 1:22-cv-10381-JEK |
| CITY OF TAUNTON, JOSHUA | ) | |
| DEOLIVEIRA, and ANDREW PACINO, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**KOBICK, J.**

This case involves a series of encounters between plaintiff Brad Waterman and officers in the Taunton Police Department. Defendant Joshua DeOliveira, a Taunton police officer, responded to a call about a disturbance at a bar in Taunton, Massachusetts called Smitty's Pub. Although the parties' accounts of what happened at the pub diverge, all agree that DeOliveira placed Waterman in protective custody and drove him home. Once there, Waterman asserts, DeOliveira used excessive force in removing his handcuffs before leaving. Waterman called 911 to report an assault by DeOliveira, prompting DeOliveira and defendant Andrew Pacino, another Taunton police officer, to return to Waterman's house. After verbal sparring, the officers arrested Waterman for disorderly conduct and took him to the police station. That charge was later dropped, but by the end of the evening, Waterman had suffered a fractured shoulder and torn rotator cuff, injuries he attributes to DeOliveira.

Waterman's complaint alleges that the officers committed a series of constitutional and state law violations over the course of the evening. The defendants have moved for summary

judgment on all counts. That motion will be granted in part and denied in part. While DeOliveira is entitled to judgment on the claims arising out of his placement of Waterman in protective custody, material disputes of fact remain regarding Waterman's claims challenging DeOliveira's use of force and Waterman's subsequent arrest for disorderly conduct. On those matters, it will be for the jury to determine whether the defendants are liable.

## BACKGROUND

The parties present conflicting narratives of the events that led to this lawsuit. Because this matter is before the Court on the defendants' motion for summary judgment, the following facts are either undisputed or recounted in the light most favorable to Waterman, the non-moving party, where supported by record evidence. *See Dixon-Tribou v. McDonough*, 86 F.4th 453, 458 (1st Cir. 2023).

## I.    Events at Smitty's Pub.

Brad Waterman is a resident of Taunton, Massachusetts. ECF 45, ¶ 1. At all relevant times, defendants Joshua DeOliveira and Andrew Pacino were police officers with the Taunton Police Department. *Id.* ¶¶ 3-4. Before the events described below, DeOliveira had not met or known of Waterman. *Id.* ¶ 21.

Waterman visited Smitty's Pub in Taunton, Massachusetts on the evening of March 15, 2019, continuing into the early morning hours of March 16, 2019. *Id.* ¶¶ 5, 26a. His truck broke down as he pulled into the parking lot sometime after 9:00 p.m. on March 15, so he planned to rely on his friend, John Silvia, who was with him at Smitty's, to be the designated driver. *Id.* ¶¶ 13a-13b, 25b, 26a. At Smitty's, Waterman drank four or five beers and ate a plate of chicken wings. *Id.* ¶¶ 6, 6a, 26a.  He considered himself too "buzzed" from the alcohol to drive safely by the end of the night. *Id.* ¶¶ 13, 26a.

Waterman was involved in a verbal and physical altercation while he was at the pub, between 12:20 a.m. and 12:40 a.m. on March 16. *Id.* ¶¶ 7-9. Several other bar patrons had approached Waterman concerning a dispute over a necklace. *Id.* ¶¶ 7a, 9a. The conflict turned physical, and Waterman was involved in two rounds of pushing and grappling, with several individuals grabbing Waterman's arms and body. *Id.* ¶ 9; *see* ECF 29-10, Video No. 23-20. Minutes later, after the fighting parties had been separated, a man approached Waterman and punched him in the mouth. ECF 45, ¶¶ 7b, 10-11; ECF 29-10, Video No. 36-42. Waterman called 911 to report the assault and asked others to do the same. ECF 45, ¶¶ 14, 14b, 16a; ECF 29-10, Video No. 36-42. According to his deposition testimony, he did not suffer any injuries to his shoulder or upper torso from these altercations at Smitty's. ECF 45, ¶ 12b; ECF 29-2, at 49:9-15.

Defendant DeOliveira and another Taunton police officer, Arsenio Chaves, who is not named as a defendant, were dispatched to Smitty's after a call came in reporting a disturbance or commotion at the pub. ECF 45, ¶¶ 16, 16a; ECF 29-4, at 18:14-18. They arrived around 12:40 a.m., while Waterman was on the phone with the 911 operators, and spoke with bar patrons outside before entering. ECF 45, ¶¶ 15a, 17a; ECF 46, ¶ 2(i); ECF 29-10, Video No. 35-58. When the officers entered the pub, Waterman approached them to report that he had been the victim of an assault. ECF 45, ¶¶ 17, 17b. Waterman started to explain that other bar patrons had falsely accused him of stealing a necklace, but DeOliveira responded, "because you did . . . five people outside just told me so." *Id.* ¶¶ 18b-18c. At that point, Waterman raised his hands behind his head and kept them clasped there. *Id.* ¶ 18d; ECF 29-10, Video No. 35-58. He asked DeOliveira if he was going to frisk him. ECF 45, ¶ 18d. The officers ordered Waterman out of the bar, gesturing in the direction of the front door, and Waterman complied. *Id.* ¶¶ 20a-20d.

Once outside the pub, DeOliveira frisked Waterman and took his wallet. *Id.* ¶ 22a. DeOliveira asked Waterman how he had gotten to the bar and Waterman responded, "my truck." *Id.* ¶¶ 22b-22c. At that point, Waterman had blood coming from his nose, and DeOliveira believed that Waterman had been the victim of an assault. *Id.* ¶¶ 7c, 22; ECF 29-4, at 33:7-10. DeOliveira then ordered Waterman to turn around and put his hands behind his back, and Waterman complied. ECF 45, ¶ 22d. DeOliveira handcuffed Waterman and placed him in the back seat of the police cruiser. *Id.* ¶¶ 22e, 23a. Because Waterman believed that he was under arrest, he stopped speaking to the officers. *Id.* ¶¶ 23b, 23c. Waterman testified that, during his interactions with the officers, neither officer told him that they were taking him home, and Waterman "didn't say another word, not a single word," while he was in the police cruiser. ECF 29-2, at 46:12-47:17.

DeOliveira took Waterman to his home in Taunton. ECF 45, ¶ 32a. Waterman believes that DeOliveira knew where to take him because his residential address was listed on the driver's license in his wallet. *Id.* ¶ 32b. The ride from Smitty's to Waterman's home took between seven and ten minutes. *Id.* ¶ 34. Although DeOliveira was alone in the police cruiser with Waterman, another officer, whose identity is not clear from the record, appears to have followed DeOliveira to Waterman's residence in a separate cruiser. ECF 29-2, at 48:22-24; ECF 46-1.

## II.    Events at Waterman's House.

Upon arrival, DeOliveira exited his cruiser and went to the rear door to let Waterman out. ECF 45, ¶ 35. DeOliveira asked Waterman to step out, and Waterman did, hands still cuffed behind his back. *Id.* ¶ 36. At this point, Waterman expressed his displeasure and asked for his wallet back. *Id.* ¶¶ 36, 37a. Standing behind Waterman's back, DeOliveira removed the handcuff from Waterman's right hand and, using it like a handle, yanked Waterman's left arm upwards while slamming Waterman's head onto the police cruiser. *Id.* ¶¶ 37b, 37c, 37d; ECF 29-2, at 48:10-24,

4

49:16-50:18. While removing the handcuff from Waterman's left arm, DeOliveira bent down and said, "I gave you a ride home." ECF 45, ¶ 37e.

After DeOliveira pulled Waterman's arm above his head, Waterman cried out in pain and then started screaming that DeOliveira had hurt him and that he was injured. *Id.* ¶¶ 41b, 41c. DeOliveira got in his cruiser and drove away, reporting to dispatch that he had cleared the incident. *Id.* ¶ 43. After DeOliveira left, Waterman's tenant, Thomas Bassett, heard Waterman's cries and came out to help him. *Id.* ¶ 42a.

Waterman went into his own home and, at 12:59 a.m., called 911, saying repeatedly that he had been assaulted by Taunton police officers. *See id.* ¶ 45b ("Hi my emergency is with Taunton Police—I'm not sure I should be speaking with you, but two Taunton police officers just assaulted me."); ECF 46, ¶ 2(ii); ECF 46-1 ("They battered me, they pounded my head . . . they beat me in my driveway."). The State 911 operator transferred Waterman to the Taunton 911 operator, who in turn transferred Waterman to the Taunton Police Department. ECF 45, ¶¶ 45c, 45d; ECF 46-1. Once connected to the Taunton Police Department, Waterman again reported that two officers had assaulted him on his property. ECF 45, ¶¶ 45e, 45f; ECF 46-1. The call then cut off, and the dispatcher contacted DeOliveira, informing him that Waterman had called 911 and was looking to speak with police officers. ECF 45, ¶¶ 45a, 45g; ECF 46-1.

DeOliveira returned to Waterman's house five to ten minutes after he had left, which was sometime after 1:00 a.m. ECF 45, ¶¶ 44a, 47. He was followed shortly thereafter by defendant Andrew Pacino in his own marked police cruiser, with other officers arriving after parking at the top of the street. *Id.* ¶ 46. Bassett was on the porch when the officers arrived. ECF 45, ¶¶ 53, 53a; ECF 29-9, at 5. Before the officers approached Waterman, he called 911 a third time, at 1:07 a.m.,

and remained on the line through the encounter. ECF 29-2, at 57:9-19; ECF 46, ¶ 2(iii); ECF 46-1.

Exiting their cruisers, DeOliveira and Pacino approached Waterman while he was standing on his porch and on the phone with 911. ECF 45, ¶¶ 48a, 48b, 49. DeOliveira ordered Waterman to get back in his house. *Id.* ¶¶ 48, 48d. Waterman reported to the 911 operator that the officers were laughing at him. *Id.* ¶ 48c; ECF 46-1. As the officers approached, Waterman pointed and yelled at them and, using profanities, screamed that they had pounded his head against the windshield and taken his license. ECF 45, ¶¶ 49, 49a, 55, 55a; ECF 46-1. The 911 call recorded the interaction, during which Waterman cursed repeatedly at the officers with a raised voice, but also responded in a measured tone to the 911 operator's questions and prompts. ECF 45, ¶ 50a; ECF 46-1. At some point, the officers went up Waterman's porch stairs and instructed him to go back inside. ECF 45, ¶¶ 52, 56c. Pacino attempted to enlist Bassett's help in getting Waterman to go inside, but Bassett could not help. *Id.* ¶ 53. DeOliveira threatened to arrest Waterman if he did not go back inside. *Id.* ¶ 56d.

Waterman then started walking to the door to go inside his house. *Id.* ¶ 56f. At that moment, DeOliveira and Pacino put their hands on him and arrested him for disorderly conduct. *Id.* ¶¶ 57, 60, 60a. They handcuffed Waterman's hands behind his back. *Id.* ¶ 61. He asked, "for cursing?" and DeOliveira answered, "yep." *Id.* ¶ 60d. The parties dispute whether the entire interaction between Waterman and the officers was captured on the 911 call and how long the interaction lasted. *Id.* ¶¶ 56a, 56b, 57. In Waterman's telling, he was arrested within 90 seconds of the officers' arrival, but in the officers' telling, they arrested him after approximately five minutes. *Id.* According to DeOliveira's subsequent incident report, the officers placed Waterman under arrest

6

because he was yelling at the officers, cursing, and refusing to go inside his house. ECF 29-9, at 5; ECF 45, ¶ 58d.

### III.   <u>Events Following the Arrest.</u>

DeOliveira put Waterman back in his cruiser and took him to the Taunton police station. ECF 45, ¶ 63. During the ride, which lasted only a few minutes, Waterman complained that the officers had hurt him. *Id.* ¶¶ 62b, 64. Waterman also reported pain in his shoulder while he was being booked. *Id.* ¶ 65. An ambulance was called, and Waterman was transported to Morton Hospital for medical treatment, where he was diagnosed with a fractured shoulder and a torn rotator cuff. *Id.* ¶¶ 65, 68; ECF 29-2, at 65:2-66:12. His condition required surgery, and he remained at the hospital for two or three days. ECF 29-2, at 66:13-67:3. The disorderly conduct charge against him was subsequently dismissed. ECF 45, ¶ 57b.

### IV.   <u>Procedural Background.</u>

Waterman brought this lawsuit in March 2022 against DeOliveira, Pacino, and the City of Taunton. Against DeOliveira, Waterman asserts a Fourth Amendment claim for excessive force under 42 U.S.C. § 1983 (Count I); a Fourth Amendment wrongful arrest claim under § 1983 challenging his placement in protective custody at Smitty's Pub and his arrest at his house (Count II); a claim under § 1983 alleging retaliation for exercising First Amendment speech rights (Count III); a claim under the Massachusetts Civil Rights Act ("MCRA"), M.G.L. c. 12, §§ 11H, 11I (Count IV); an assault and battery claim (Count V); an Eighth Amendment claim under § 1983 (Count VI); a false imprisonment claim for placing him in protective custody at Smitty's Pub (Count VII); and a false imprisonment claim for arresting him at his home (Count VIII). *See* ECF 1, ¶¶ 34-64. Against Pacino, Waterman asserts a Fourth Amendment wrongful arrest claim under § 1983 (Count IX); a claim under § 1983 alleging retaliation for exercising his First Amendment

speech rights (Count X); an Eighth Amendment claim under § 1983 (Count XI); and a false imprisonment claim for arresting him at his home (Count XII). *See id.* ¶¶ 65-80. Against the City of Taunton, Waterman asserts a claim of negligence (Count XIII). *See id.* ¶¶ 81-88.

After a period of discovery, the defendants moved for summary judgment on all counts. At the motion hearing, Waterman confirmed that he is no longer pursuing the Eighth Amendment claims (Counts VI and XI) and the negligence claim (Count XIII). Judgment will accordingly enter for the defendants on those claims.

## STANDARD OF REVIEW

Summary judgment is appropriate when, based upon the record, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). To prevail, the moving party must show that "there is no factual determination which a 'rational factfinder' could make as to the 'existence or nonexistence' of a fact that 'has the potential to change the outcome of the suit.'" *Gibson Found., Inc. v. Norris*, 88 F.4th 1, 5 (1st Cir. 2023) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 4-5 (1st Cir. 2010)). Courts "must consider the record and the reasonable inferences drawn therefrom in the light most favorable to the nonmovant," but "need not credit 'conclusory allegations, improbable inferences, and unsupported speculation.'" *Dixon-Tribou*, 86 F.4th at 458 (quoting *Lahens v. AT&T Mobility Puerto Rico, Inc.*, 28 F.4th 325, 333 (1st Cir. 2022)). The non-moving party may not simply "rest upon mere allegation or denials," but instead must "present affirmative evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).

## DISCUSSION

### I.      Wrongful Arrest and False Imprisonment Claims.

Waterman asserts that DeOliveira wrongfully arrested him, in violation of the Fourth Amendment, and committed the common law tort of false imprisonment, when DeOliveira took him into protective custody at Smitty's Pub. He also asserts that DeOliveira and Pacino committed the same violations when they later arrested him for disorderly conduct at his house. The defendants contend that they committed no constitutional or common law violations and, in any event, are entitled to qualified immunity on the constitutional claims. Drawing all factual inferences in favor of Waterman, the Court agrees that DeOliveira is entitled to judgment on the claims involving Waterman's protective custody confinement, but concludes that judgment for DeOliveira and Pacino on the claims involving the disorderly conduct arrest is not warranted.

### A.      The Probable Cause and Qualified Immunity Standards.

The Fourth Amendment's protections against "unreasonable searches and seizures" require warrantless arrests to be supported by probable cause. U.S. Const. amend. IV; *see Karamanoglu v. Town of Yarmouth*, 15 F.4th 82, 87 (1st Cir. 2021) ("A federal constitutional tort of false arrest—and thus an unlawful arrest under § 1983—occurs when there is detention without probable cause and without legal process (i.e., without a valid warrant).") The probable cause requirement also "extends to certain types of custody that, though short of an arrest, possess attributes that are characteristic of an arrest." *Alfano v. Lynch*, 847 F.3d 71, 76 (1st Cir. 2017). Thus, to take someone into protective custody under Massachusetts law, officers must have probable cause to believe the person is "incapacitated." *Commonwealth v. O'Brien*, 434 Mass. 615, 622 (2001).[1]

---

[1] DeOliveira does not dispute that, in the circumstances of this case, taking Waterman into protective custody—by placing him in handcuffs and driving him to his house—sufficiently resembled an arrest such that the probable cause standard applies. *Cf. Alfano*, 847 F.3d at 78 n.4

The common law tort of false imprisonment is "joined at the hip" with the constitutional claim of wrongful arrest. *Finamore v. Miglionico*, 15 F.4th 52, 61 (1st Cir. 2021). It requires a plaintiff to show, among other things, that they were unlawfully confined, directly or indirectly, by a law enforcement officer. *See id.* (citing *Walker v. Femino*, 311 F. Supp. 3d 441, 455 (D. Mass. 2018)). A police officer who lacks probable cause for an arrest may be held liable for false imprisonment. *Id.* False imprisonment claims against police officers, therefore, rise and fall with the constitutional wrongful arrest analysis, at least insofar as both require probable cause.

"[P]robable cause to perform a warrantless arrest turns on 'whether at that moment the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense'" or was incapacitated. *Vargas-Badillo v. Diaz-Torres*, 114 F.3d 3, 6 (1st Cir. 1997) (alteration in original) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). The probable cause inquiry calls for "'an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,'" and "not on the officer's actual state of mind at the time the challenged action was taken." *Maryland v. Macon*, 472 U.S. 463, 470-71 (1985) (quoting *Scott v. United States*, 436 U.S. 128, 136 (1978)).

Even when an individual has been subject to an unlawful arrest, the police officer may nevertheless be entitled to qualified immunity on constitutional claims for damages arising out of that arrest. The doctrine "seeks to balance two opposing interests: 'the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Berge v. Sch.*

---

(noting that "something less than probable cause might justify a briefer, less intrusive detention under the Massachusetts protective custody statute").

*Comm. of Gloucester*, __ F.4th __, No. 22-1954, 2024 WL 3408206, at *4 (1st Cir. July 15, 2024) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). As developed, the doctrine "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

The qualified immunity inquiry "proceeds with a now-familiar two-part test: '(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Penate v. Hanchett*, 944 F.3d 358, 366 (1st Cir. 2019) (quoting *Rocket Learning, Inc. v. Rivera-Sánchez*, 715 F.3d 1, 8 (1st Cir. 2013)). "The 'clearly established' inquiry itself has two elements." *Id.* (citing *MacDonald v. Town of Eastham*, 745 F.3d 8, 12 (1st Cir. 2014)). The first element requires courts to consider "the clarity of the law at the time of the violation." *Id.* (quoting *Drumgold v. Callahan*, 707 F.3d 28, 42 (1st Cir. 2013)). That can be satisfied by finding binding or persuasive case law addressing similar facts, or a more general accepted proposition that applies with obviousness to the facts in question. *Berge*, 2024 WL 3408206, at *4. The second element requires courts to consider "the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiff's constitutional rights." *Penate*, 944 F.3d at 366 (quoting *Drumgold*, 707 F.3d at 42).

When a defendant asserts a qualified immunity defense on summary judgment, a court must "first identif[y] the version of events that best comports with the summary judgment standard and then as[k] whether, given that set of facts, a reasonable officer should have known that his actions were unlawful." *Morelli v. Webster*, 552 F.3d 12, 19 (1st Cir. 2009); *see also Alfano*, 847 F.3d at 79-80 (in conducting a qualified immunity analysis, the court must take as true the plaintiff's "supportable version of the facts" even if the officer presents a competing narrative).

B.    Placement in Protective Custody at Smitty's Pub.

The parties agree that when DeOliveira put Waterman in handcuffs and drove him home from Smitty's, Waterman had not been arrested for a crime, but rather had been placed in protective custody under M.G.L. c. 111B, § 8. *See Commonwealth v. O'Brien*, 434 Mass. 615, 621 (2001) (people under protective custody "are not under arrest, but are merely in need of treatment and temporary protection"). That statute authorizes police officers to take "[a]ny person who is incapacitated" to their residence, a police station, or a detoxification treatment facility, "with or without [the person's] consent." M.G.L. c. 111B, § 8. "[I]ncapacitated" is defined as "the condition of an intoxicated person who, by reason of the consumption of intoxicating liquor is (1) unconscious, (2) in need of medical attention, (3) likely to suffer or cause physical harm or damage property, or (4) disorderly." *Id.* § 3. Thus, the statute requires probable cause that the individual is "*both* intoxicated *and* either unconscious, in need of medical attention, likely to suffer or cause physical harm or damage, or disorderly." *Veiga v. McGee*, 26 F.3d 1206, 1210 (1st Cir. 1994) (emphases in original).

DeOliveira contends that he had probable cause to believe that Waterman was intoxicated and likely to suffer or cause physical harm. Precedent supplies guideposts for the application of these elements of the test. On the one hand, an officer does not have probable cause to take someone into protective custody based on evidence of intoxication alone, when there is no basis to believe that the person is likely to injure themselves or another person or damage property. *See Alfano*, 847 F.3d at 79-80. On the other hand, probable cause exists under the protective custody statute when an intoxicated individual is immediately about to drive. *See Commonwealth v. Tomeo*, 400 Mass. 23, 24-25 (1987). And under certain circumstances, probable cause exists to take into custody a person who is highly intoxicated and has no means of reaching a safe place. *See O'Brien*,

434 Mass. at 616 n.2, 616-17, 622-23 (officers had probable cause to place a defendant in protective custody where he had been arrested for drunk driving and was still intoxicated hours later and had no safe means of returning home); *Commonwealth v. O'Connor*, 406 Mass. 112, 114-15, 120 (1989) (officer had probable cause to place a defendant in protective custody where he was found near a crashed truck on the side of the road, was unsteady on his feet, denied being in the truck, and had difficulty communicating).

On Waterman's supported version of the facts, DeOliveira had probable cause to believe Waterman was intoxicated within the meaning of M.G.L. c. 111B, § 3. While Waterman denies DeOliveira's account that he appeared to be "heavily intoxicated," he acknowledges that he drank four or five beers over the evening and was too intoxicated to drive when he was taken into custody. ECF 45, ¶¶ 26, 26a, 26e. DeOliveira also had probable cause to believe that Waterman was likely to suffer or cause physical harm. DeOliveira was dispatched to Smitty's Pub in response to a commotion. When he arrived, he was told by multiple patrons outside the bar that Waterman had stolen a necklace. Proceeding into the bar, he met Waterman, who appeared to have consumed alcohol, had blood coming from his nose, and reported that he had been the victim of an assault. Waterman also denied stealing the necklace. Thus, as DeOliveira arrived at the scene, he learned that there had recently been a bar fight leading to an assault; that Waterman, a victim, had an ongoing disagreement with other bar patrons about whether he had stolen a necklace; and that Waterman could not safely drive himself away from the pub due to his level of intoxication.

The facts known to DeOliveira would lead a prudent officer to conclude that Waterman faced a risk of ongoing harm from other bar patrons and posed a risk of harm to himself or others. Waterman disagrees, contending that because his truck had broken down and he had arranged for a designated driver to take him home, he posed no risk of harm due to his level of intoxication.

13

But the "relevant inquiry is whether . . . the facts *known to the officer at the time of the arrest* support probable cause." *Karamanoglu*, 15 F.4th at 88 (emphasis in original). And on Waterman's telling of the facts, he did not say to DeOliveira, and DeOliveira did not know, that he had a ride home with a designated driver. In other circumstances, an officer might not have probable cause to determine that an intoxicated individual poses a risk of harm absent an inquiry into whether that individual has another means of transport. *Cf. Alfano*, 847 F.3d at 80 (no risk of harm where the officer knew that the intoxicated individual would be travelling by bus, and thus had no reason to think he was planning to drive himself home). Here, however, Waterman not only posed a risk of harm to himself or others if he attempted to drive home, but also faced a risk of physical harm from the other patrons outside the bar, who had just assaulted him and continued to assert that he had stolen a necklace, and, for the same reasons, posed a risk of harm to his antagonists.

Viewing the totality of the facts in the light most favorable to Waterman, a jury could not reasonably conclude that DeOliveira lacked probable cause to believe Waterman was incapacitated. Because DeOliveira had probable cause to take Waterman into protective custody, the motion for summary judgment will be granted on Waterman's claims of wrongful arrest and false imprisonment in connection with the protective custody confinement.

      C.    <u>Arrest for Disorderly Conduct.</u>

When Waterman was taken into custody the second time that evening at his home, he was arrested on a charge of disorderly conduct. The disorderly conduct statute, M.G.L. c. 272, § 53(b), sets the punishment for "disorderly persons," but does not define that term. As construed by the Supreme Judicial Court, the statute looks to subsections (a) and (c) of § 250.2(1) of the Model Penal Code to define "disorderly." *See Commonwealth v. Accime*, 476 Mass. 469, 472-73 (2017); *Commonwealth v. Sholley*, 432 Mass. 721, 728 (2000). Those sections provide that a "person is

guilty of disorderly conduct if, with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he: (a) engages in fighting or threatening, or in violent or tumultuous behavior; or . . . (c) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor." Model Penal Code § 250.2(1).[2] The term "public" means "affecting or likely to affect persons in a place to which the public or a substantial group has access," including "any neighborhood." *Id.*

DeOliveira and Pacino contend that they had probable cause to believe that Waterman's conduct on his front porch constituted "tumultuous" behavior under subsection (a). "Tumultuous" conduct, "while perhaps not physically violent, may nevertheless be characterized as involving riotous commotion and excessively unreasonable noise so as to constitute a public nuisance." *Commonwealth v. A Juvenile*, 368 Mass. 580, 597 (1975); *accord Sholley*, 432 Mass. at 729. The First Circuit has explained that "excessively unreasonable noise late at night in a residential neighborhood so that people in the privacy of their homes are unable to avoid that noise" is not conduct, without more, that ranks as "tumultuous" under the statute. *Veiga*, 26 F.3d at 1213. That is because speech and expressive conduct alone cannot constitute disorderly conduct. *Id.* at 1213-14; *see A Juvenile*, 368 Mass. at 593-94. Furthermore, refusing an order of a police officer is not per se disorderly conduct. *See, e.g.*, *Sheehy v. Town of Plymouth*, 191 F.3d 15, 22-23 (1st Cir. 1999), *abrogated on other grounds by Devenpeck v. Alford*, 543 U.S. 146 (2004) (a defendant who refused to give an officer his name when he had given his name to another officer was not engaged in disorderly conduct). Applying these principles in a case with nearly identical facts, another session of this Court has held that yelling, screaming, and cursing at a police officer in a residential

---

[2] To avoid First Amendment concerns, subsection (c) is "restricted to cases not involving protest or other expressive activities." *Sholley*, 432 Mass. at 728 (citing *Commonwealth v. Feigenbaum*, 404 Mass. 471 (1989)).

neighborhood late at night is not, without more, tumultuous behavior under the statute. *Nuon v. City of Lowell*, 768 F. Supp. 2d 323, 327-28, 332-33 (D. Mass. 2011); *see also United States v. Pasqualino*, 768 F. Supp. 13, 15 (D. Mass. 1991), *cited with approval in Viega*, 26 F.3d at 1213 (yelling, screaming, and cursing at police officer in hotel parking lot, loudly enough to "attract the attention of other guests in the hotel," does not constitute disorderly conduct).

Drawing factual inferences in favor of Waterman, a reasonable jury could readily conclude that the officers lacked probable cause to arrest him for disorderly conduct. When the officers arrived at Waterman's house, he was standing on his front porch, on the phone with the 911 operator. He yelled at the officers, pointed at them, swore at them, and did not immediately follow their instructions to go inside his house. There is no evidence—on either Waterman's or the officers' versions of the facts—that any physical contact took place between Waterman and the officers, that Waterman threatened harm to the officers, or that Waterman was boisterous enough to attract a crowd of onlookers. *See Accime*, 476 Mass. at 475 n.9, 476 (behavior that constitutes disorderly conduct typically "attract[s] [a] crowd of onlookers"). Indeed, DeOliveira testified in his deposition that Waterman was not acting in a way that caused him concern for his own safety or for the safety of other officers. ECF 29-4, at 69:6-24. And when Waterman asked DeOliveira whether he had been arrested for cursing, DeOliveira answered, "yep." ECF 45, ¶ 60d. DeOliveira's incident report largely corroborates Waterman's account of the facts; it describes Waterman yelling and using profanity at the officers, and refusing two orders to go inside his house, but does not describe threats, physical contact, or aggressive gestures. *See* ECF 29-9, at 5.[3]

---

[3] Pacino testified at his deposition that Waterman raised his middle finger at the officers. ECF 29-6, at 12:16-23, 14:22-15:25. DeOliveira testified that Waterman "was doing a lot of pointing," but he did not report that Waterman extended his middle finger. ECF 29-4, at 70:1-13. DeOliveira's incident report does not mention any such gesture. *See* ECF 29-9, at 5. Waterman denies raising his middle finger and agrees with DeOliveira's recollection that he pointed at the officers. ECF 45,

On these facts, Waterman's conduct does not constitute "riotous commotion and excessively unreasonable noise," so as to fall within the "tumultuous" behavior component of the disorderly conduct statute. *A Juvenile*, 368 Mass. at 597. No evidence exists that Waterman did anything other than loudly and profanely express his views about police officers from the front porch of his own home. *See Nuon*, 768 F. Supp. 2d at 333 (the plaintiff "was lawfully on private property expressing his opinion regarding the actions of a public official and there was no probable cause that he was committing the offense of disorderly conduct"). Offensive and abusive speech does not, without more, give an officer probable cause to arrest someone for disorderly conduct. *See Veiga*, 26 F.3d at 1213; *Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011) ("In our society, police officers are expected to endure significant burdens caused by citizens' exercise of their First Amendment rights."). Indeed, "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Houston v. Hill*, 482 U.S. 451, 462-63 (1987).

Resisting this conclusion, the defendants highlight the additional undisputed fact that Waterman's tenant, Bassett, was on the porch during the encounter. And they point out that the officers had no basis for knowing that Bassett was Waterman's tenant or that he had previously come out of the house to assist Waterman after he cried out in pain. But the presence of one third party observing an individual's noisy criticism of police officers does not, without more, give rise to probable cause for a disorderly conduct arrest. This case is not remotely comparable to *Sholley*, in which the defendant engendered an "extreme level of noise and commotion" in the hallways of a courthouse that attracted a "number of persons who abandoned their ordinary duties to respond."

---

¶ 49a. Because the Court must draw factual inferences in favor of Waterman on summary judgment, it accepts Waterman and DeOliveira's account.

432 Mass. at 729. The defendant's outburst—including threatening remarks and loud screaming—"gave rise to [such] a sense of emergency on the part of those who heard it" that a court officer abandoned a sitting judge to assist, an assistant district attorney came out of concern for the wellbeing of her staff, and three police officers abandoned their activities in response to the commotion. *See id.* at 729-30. Others responded, too, and onlookers left offices and courtrooms to see what was happening. *Id.* at 730. Under those circumstances, the presence of third parties supported the determination that the defendant's conduct was tumultuous. *Id.* Here, in contrast, the presence of a single third party on the porch when the officers arrived would not indicate to a prudent officer that Waterman's behavior constituted a "riotous commotion." *A Juvenile*, 368 Mass. at 597; *see Pasqualino*, 768 F. Supp. at 15 ("Though Mr. Pasqualino's yelling was undoubtedly loud enough to attract the attention of other guests in the hotel, it does not appear to this Court to have risen to the level of 'riotous commotion' or 'public nuisance.'"). A reasonable officer would not conclude, on these facts, that they had probable cause to arrest Waterman for disorderly conduct.

The defendants contend that they are nevertheless entitled to qualified immunity on the wrongful arrest claim. When a plaintiff asserts "a § 1983 claim that seeks to hold a police officer liable for making a warrantless arrest without probable cause, 'if the presence of probable cause is arguable or subject to legitimate question, qualified immunity will attach.'" *Wilber v. Curtis*, 872 F.3d 15, 21 (1st Cir. 2017) (quoting *Cox v. Hainey*, 391 F.3d 25, 31 (1st Cir. 2004)). The absence of probable cause is not here arguable or subject to legitimate question. The law at the time of Waterman's arrest clearly established that noisy and profane speech, in a neighborhood in the middle of the night, does not, without more, give rise to probable cause for a disorderly conduct arrest. The First Circuit explained as much in 1994, rejecting a jury instruction that disorderly

conduct could include "excessively unreasonable noise late at night in a residential neighborhood so that people in the privacy of their homes are unable to avoid that noise." *Veiga*, 26 F.3d at 1213. And this Court had likewise held as much on virtually identical facts. *See Nuon*, 768 F. Supp. 2d at 327-28, 332-34; *Pasqualino*, 768 F. Supp. at 15. Furthermore, the Supreme Judicial Court has long made clear that an individual may not be arrested on a disorderly conduct charge based on speech or expressive conduct alone. *See, e.g.*, *A Juvenile*, 368 Mass. at 597-99. In light of these settled principles, no objectively reasonable police officer could have concluded—even on DeOliveira and Pacino's versions of the facts—that probable cause existed to arrest Waterman. Put otherwise, an objectively reasonable officer in their shoes "would have understood that his conduct violated the plaintiff's constitutional rights." *Penate*, 944 F.3d at 366.

The defendants have no answer to the weight of this precedent. The Supreme Judicial Court, First Circuit, and this Court have, for decades, construed the disorderly conduct statute to prevent the arrest of those who exercise their First Amendment rights by voicing criticism of law enforcement officers or other public officials. Qualified immunity does not shield the officers from liability under these circumstances.

The motion for summary judgment will, accordingly, be denied as to the wrongful arrest and false imprisonment claims arising out of Waterman's disorderly conduct arrest.

## II.   <u>Excessive Force and Assault and Battery Claims.</u>

Waterman claims that DeOliveira used excessive force against him, in violation of the Fourth Amendment, when DeOliveira used one handcuff as a handle to yank Waterman's left arm above his head, resulting in a fractured shoulder and torn rotator cuff, and smashed his head into the police cruiser. Waterman similarly claims that this conduct amounted to an assault and battery. Relying principally on his gentler rendition of the facts, DeOliveira contends that no reasonable

jury could find his use of force after taking Waterman into protective custody excessive, and that Waterman's claim fails as a matter of law for want of expert testimony regarding the cause of his injuries.

A.     Unreasonable Use of Force.

The Fourth Amendment "guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." *Graham v. Connor*, 490 U.S. 386, 394 (1989) (quoting U.S. Const. amend. IV). This includes a right against the use of excessive force "in the context o[f] arrest[s] and investigatory stop[s]." *Id.* To prevail on a claim of excessive force, "a plaintiff must show that the defendant employed force that was unreasonable under all the circumstances." *Morelli*, 552 F.3d at 23. In determining whether an application of force is reasonable, a Court must consider "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether [the suspect was] actively resisting arrest or attempting to evade arrest by flight." *Gray v. Cummings*, 917 F.3d 1, 8 (1st Cir. 2019) (quoting *Graham*, 490 U.S. at 396). Those factors are analyzed objectively and considered from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396-97. Under Massachusetts law, assault and battery claims against police officers rise and fall with the excessive force analysis. *Raiche v. Pietroski*, 623 F.3d 30, 40 (1st Cir. 2010).

On Waterman's well supported version of the facts, from the time he was handcuffed and taken into protective custody at Smitty's until the arrival at his house, he did not speak with DeOliveira. He sat quietly in the police cruiser because he believed he was under arrest. When DeOliveira let him out of the car, he expressed his displeasure and asked for his wallet back. DeOliveira then pinned Waterman to the cruiser from behind, uncuffed his right wrist, smashed

his head against the cruiser, and used the open cuff as a handle to wrench his cuffed arm above his head with such force that it tore his rotator cuff and broke his shoulder. Waterman testified that, at that moment, his "eyes rolled into [his] head" and he "went black," in shock, then immediately started screaming. ECF 29-2, at 48:16-21, 50:20-23.

Should a jury accept Waterman's version of the encounter, it could plainly find DeOliveira's use of force objectively unreasonable. At the time the force was applied, Waterman had not committed any crime, but rather had been taken into protective custody. *See Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst*, 810 F.3d 892, 899 (4th Cir. 2016) ("When the subject of a seizure ha[s] not committed any crime, [the severity of the crime] factor weighs heavily in [the subject's] favor." (quotation marks omitted)). Waterman verbally expressed his displeasure, but there is no evidence that he posed a threat to DeOliveira, that he was resisting arrest, or that he was attempting to flee. He remained restrained by handcuffs. Even accepting DeOliveira's disputed testimony that Waterman was yelling and unintentionally spitting in DeOliveira's face as DeOliveira sought to uncuff him, *see* ECF 29-4, at 41:21-42:3, there is no evidence that Waterman was violent or a danger to himself or others. Indeed, DeOliveira testified that Waterman did not "struggle at all or put up any resistance" during the uncuffing, and that he "wasn't being violent." *Id.* at 48:9-19. Thus, the second and third factors also weigh strongly in favor of Waterman. *See Morelli*, 552 F.3d at 23 (reversing summary judgment for officer on excessive force claim where there was "no evidence cognizable under the summary judgment standard indicating that the plaintiff posed a threat to the safety of the officers or others" or evidence "of any meaningful degree of resistance").

To the extent DeOliveira has preserved a qualified immunity defense, he is not entitled, on this record, to qualified immunity on the excessive force claim.[4] The First Circuit's 2009 decision in *Morelli* held, on highly analogous facts, that its case law "supplies a crystal clear articulation of the right, grounded in the Fourth Amendment, to be free from the use of excessive force by an arresting officer." 552 F.3d at 23. Having deemed the right clearly established in precedent, the First Circuit considered whether, on the facts of the case, a reasonable officer would have understood that his conduct violated that right. *Id.* at 24. And it held that no reasonable officer could think it constitutional to "yan[k] the arm of an unarmed and non-violent person, suspected only of the theft of $20, and pi[n] her against a wall for three to four minutes with sufficient force to tear her rotator cuff." *Id.* Again, so too here: no reasonable officer could think it constitutional to yank the arm of a handcuffed and unarmed person, not suspected of having committed a crime and putting up no resistance, with enough force to break his shoulder and tear his rotator cuff.

B.     Whether Expert Testimony is Needed to Prove Causation.

DeOliveira raises a final argument: that Waterman cannot, as a matter of law, substantiate his excessive force claim without expert testimony about the cause of his injuries. It is undisputed that Waterman's rotator cuff was torn and shoulder fractured in the early morning hours of March 16, 2019. But DeOliveira contends, correctly, that the parties dispute whether *he* inflicted those injuries while removing the handcuffs, or whether Waterman instead suffered the injuries during the earlier bar fight at Smitty's. Absent medical testimony about the cause of Waterman's injuries, DeOliveira insists, a jury would be left only to speculate.

---

[4] The defendants mention the excessive force claim at the beginning of the qualified immunity section of their brief, ECF 28, at 10, but their qualified immunity argument itself is exclusively concerned with the wrongful arrest claims, *id.* at 10-13. Qualified immunity is an affirmative defense that is forfeited if not raised. *Lawless v. Town of Freetown*, 63 F.4th 61, 65 (1st Cir. 2023).

The First Circuit has resisted adopting categorical rules for when expert testimony is required in excessive force cases. "'The facts of every case will determine whether expert testimony would assist the jury,'" the First Circuit has explained, and "'a blanket rule that expert testimony is generally admissible in excessive force cases would be just as wrong as a blanket rule that it is not.'" *Jennings v. Jones*, 499 F.3d 2, 15 (1st Cir. 2007) (quoting *Kopf v. Skyrm*, 993 F.2d 374, 379 (4th Cir. 1993)). Generally, when questions about causation in excessive force cases are within the range of the common experience of jurors, expert testimony is not necessary. *See id.* ("cases may be susceptible to a common sense determination by the jury" when there is "some basis in the evidence on which to ground a finding of excessive force" (quotation marks omitted)); *Ziesmer v. Hagen*, 785 F.3d 1233, 1239 (8th Cir. 2015) ("'expert testimony is not necessary' to prove causation when the 'inferences to be drawn from the facts are within the range of common experience' of the jury members" (quoting *Hill v. Gonzalez*, 454 F.2d 1201, 1203 (8th Cir. 1972))). But when an injury is sophisticated or unusual, it falls outside the ordinary experience of jurors, and expert testimony about its cause is likely needed. *See Awnings v. Fullerton*, 912 F.3d 1089, 1098-99 (8th Cir. 2019) (fractured ribs and collapsed lung were internal, sophisticated injuries that require expert testimony to corroborate, at least where they were not discovered by medical professionals immediately after the use of force); *Ziesmer*, 785 F.3d at 1239 ("It is true that '[w]hen an injury is sophisticated, proof of causation generally must be established by expert testimony'" (quoting *Robinson v. Hager*, 292 F.3d 560, 564 (8th Cir. 2002))).

Waterman's lack of expert medical testimony does not preclude a jury from making an informed determination about the cause of his injuries. The Court reaches this conclusion for two reasons. First, the dispute over causation here is not whether, from a medical perspective, Waterman's injuries *could* have been caused by DeOliveira's use of force. Rather, it involves a

23

basic credibility assessment. Waterman testified in his deposition that he was not injured following the bar fight at Smitty's, but that after DeOliveira wrenched his arm above his head with the handcuff handle, he immediately started screaming, "you hurt me," and his arm "wasn't working right." ECF 29-2, at 48:15-51:9. DeOliveira's narrative of the uncuffing does not include yanking Waterman's arm above his head with force. *See* ECF 29-4, at 40-50. The jurors, experts at making credibility determinations, can listen to the parties' testimony, considered in light of the other evidence introduced at trial, and decide whether or not to believe it. Second, and although the question is closer, Waterman's injuries are not the kind of sophisticated and unusual injuries that require a medical expert to opine on causation. Instead, a broken bone and torn rotator cuff, like the neck and back injuries at issue in *Ziesmer*, are within the range of jurors' ordinary experience. *See* 785 F.3d at 1239 ("Given that Ziesmer claims he began experiencing neck pain shortly after the alleged altercation with Trooper Hagen, and given that there is no evidence suggesting he experienced any such pain before August 2010, a layperson could conclude that Ziesmer's symptoms were caused by the trauma to his neck and back."). Laypersons would be able to listen to Waterman's account and decide whether to credit his testimony that those particular injuries were caused by DeOliveira's use of force.

This conclusion is fortified by the First Circuit's decision in *Jennings*. Although that case concerned the need for expert testimony regarding the reasonableness of the use of force, rather than the cause of the injuries, the First Circuit cited with approval *Adewale v. Whalen*, 21 F. Supp. 2d 1006 (D. Minn. 1998), which was a causation case. *See Jennings*, 499 F.3d at 15. In *Adewale*, the plaintiff had suffered a fractured forearm after an encounter with a police officer resulting in arrest. *See* 21 F. Supp. 2d at 1010-11. The parties offered conflicting narratives about the officer's actions during the arrest. *Id.* at 1014. The officer argued that he was entitled to summary judgment

because the plaintiff did not proffer expert medical testimony on the cause of her broken arm. *Id.* The court rejected that argument, reasoning that "[i]f plaintiff's version of the facts is believed, the jury could conclude without expert testimony that defendant Whelan used excessive force, and that his actions caused plaintiff's broken arm." *Id.* Here, the jury can likewise listen to Waterman's and DeOliveira's recollections of their encounter, determine who to believe, and decide whether DeOliveira's actions caused Waterman's broken shoulder and torn rotator cuff.

DeOliveira's motion for summary judgment is, accordingly, denied as to the excessive force and assault and battery claims.

## III.   First Amendment and Massachusetts Civil Rights Act Claims.

Waterman separately brings a First Amendment retaliatory arrest claim against DeOliveira and Pacino and a related claim under the MCRA, M.G.L. c. 12, §§ 11H, 11I, against DeOliveira. He argues that the officers arrested him in retaliation for his protected speech—namely, his 911 call reporting that he had been assaulted by Taunton police officers and his vocal criticism of the police when they returned to his house after the 911 call.

"In a section 1983 claim of retaliatory prosecution for First Amendment activity, a plaintiff must prove that [his] conduct was constitutionally protected and was a 'substantial or motivating' factor for the retaliatory decision, and that there was no probable cause for the criminal charge." *Gericke v. Begin*, 753 F.3d 1, 6 (1st Cir. 2014) (quoting *Powell v. Alexander*, 391 F.3d 1, 17 (1st Cir. 2004)). Alternatively, if there was probable cause, the plaintiff may "presen[t] objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves v. Bartlett*, 587 U.S. 391, 407 (2019).

In seeking summary judgment on the First Amendment claims, DeOliveira and Pacino do not contend that Waterman's speech immediately before the disorderly conduct arrest was not

protected. Nor do they argue that there was no causal link between the speech and the arrest. Instead, their sole argument is that there was probable cause for Waterman's arrest. But as discussed, a genuine dispute of fact exists as to whether they had probable cause to arrest Waterman for disorderly conduct. Their motion for summary judgment therefore fails as to the First Amendment claim.[5]

"To establish a claim under the [MCRA], a plaintiff must prove that (1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) such interference was by threats, intimidation, or coercion." *Barron v. Kolenda*, 491 Mass. 408, 423 (2023) (quoting *Glovsky v. Roche Bros. Supermkts., Inc.*, 469 Mass. 752, 762 (2014)). DeOliveira contends that he is entitled to judgment on the MCRA claim because a constitutional violation itself cannot be coercive under the statute. The Supreme Judicial Court held in *Longval v. Commissioner of Correction* that "[s]hackling and handcuffing [the plaintiff] and taking him to Concord was not *by itself* coercive under the" MCRA, but if "the officials had some further purpose in treating [him] as they did, threats, intimidation, or coercion might be involved." 404 Mass. 325, 333 (1989) (emphasis added). Here, Waterman has identified that further purpose: he argues that DeOliveira violated the MCRA by arresting him for disorderly conduct without probable cause *and* by arresting him to prevent his exercise of free speech rights.

A reasonable jury could find, given the lack of probable cause, that DeOliveira and Pacino could hear Waterman complaining to the 911 operator about DeOliveira's prior alleged conduct, and that they arrested Waterman for that call or for using profane language to criticize them— speech protected under the First Amendment. *See Houston*, 482 U.S. at 462-63; M.G.L. c. 12,

---

[5] The defendants do not argue that they are entitled to qualified immunity on Waterman's First Amendment retaliatory arrest claims. The defense is, accordingly, forfeited as to those claims. *See Lawless*, 63 F.4th at 65.

§ 11H. Arresting someone to prevent them from taking a constitutionally protected action—here, speech—is coercive under Massachusetts law. *See Barron*, 491 Mass. at 424; *Tortora v. Inspector of Bldgs. of Tewksbury*, 41 Mass. App. Ct. 120, 123-24 (1996).[6]

The defendants' motion will, accordingly, be denied on the First Amendment and MCRA claims.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is GRANTED on Counts VI, VII, XI, and XIII. The motion is GRANTED on Count II, to the extent it alleges wrongful arrest with respect to Waterman's placement in protective custody, but DENIED to the extent it alleges wrongful arrest with respect to Waterman's arrest for disorderly conduct. The motion is DENIED as to all other counts.

SO ORDERED.

/s/ Julia E. Kobick
Julia E. Kobick
United States District Judge

Dated: July 30, 2024

---

[6] DeOliveira argues in passing that qualified immunity applies to the MCRA claim. *See Duarte v. Healy*, 405 Mass. 43, 46-47 (1989) (recognizing qualified immunity as a defense to MCRA claims). But he develops no specific qualified immunity argument concerning the MCRA claim, nor have the defendants advanced a qualified immunity argument at all as to the First Amendment claim, the closest analogous federal claim. Notwithstanding the forfeiture, it is clearly established that it is unconstitutional to arrest someone because of criticism directed at an officer such that qualified immunity would not apply. *Cf. Barron*, 491 Mass. at 424-25.